## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOSEPH STEVEN GACHA, JR.,** | : | **CIVIL NO. 1:13-CV-616** |
| | : | |
| **Petitioner** | : | **(Chief Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **JOSEPH MAZURKIEWICZ,** *et al.*, | : | |
| | : | |
| **Respondents** | : | |

## MEMORANDUM

Petitioner Joseph Steven Gacha ("Gacha") filed the instant petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging a judgment and conviction imposed in the Court of Common Pleas of Luzerne County, Pennsylvania. (Doc. 1). For the reasons discussed below, the court will deny the petition.

## I.    Factual Background

The factual background of this case has been summarized by the Pennsylvania Superior Court as follows:

> On the night of May 27, 2004, [Gacha] and Daniel Kukucha were together, looking for drugs. Kukucha believed that there were drugs and money to be found at a residence at 150 Howard Street, in Larksville, Pennsylvania. Kukucha and [Gacha] drove to that residence and entered a rear garage apartment. They encountered Carrie Martin and asked her for marijuana. When Martin stated that she had none, Kukucha picked up a lockbox from the floor. As Martin tried to stop Kukucha, [Gacha] grabbed Martin from behind. Martin bit [Gacha's] finger. Martin was forced to the floor and stabbed in the neck with a knife. [Gacha] took the lockbox to Kukucha's vehicle. When he returned, Kukucha was kicking Martin in the head. [Gacha]

stabbed Martin in the back. [Gacha] left the apartment with Kukucha, taking a DVD and video game player with him.

[Gacha] was arrested on June 2, 2004 in connection with Martin's death. [Gacha] was charged with murder in the first degree, murder in the second degree, conspiracy to commit robbery, robbery, and theft by unlawful taking or disposition. 18 Pa.C.S.A. §§ 2502(a), 2502(b), 903(a)(1), 3701(a)(1)(i)(v), 3921(a). On the day of his arrest, [Gacha] gave inculpatory statements about Martin's death and the robbery to the police.

(Doc. 35-1 at 69-70, <u>Commonwealth v. Gacha</u>, No. 1821 MDA 2006 (Pa. Super. 2006) (footnote omitted)).

## II.   <u>State Court Proceedings</u>[1]

On June 2, 2004, Gacha was arrested and charged with murder in the first degree, murder in the second degree, conspiracy to commit robbery, robbery, and theft by unlawful taking or disposition, in connection with the death of Carrie Martin.[2] (Doc. 1; <u>https://ujsportal.pacourts.us</u>, electronic docket number CP-40-CR-0002758-2004). On November 9, 2004, the Commonwealth filed its Notice of Aggravating Circumstances pursuant to Rule 802 of the Pennsylvania Rules of Criminal Procedure, alleging that Gacha killed the victim in perpetration of a felony. (<u>Id.</u>)

---

[1] A federal habeas court may take judicial notice of state court records. <u>Minney v. Winstead</u>, 2013 WL 3279793, at *2 (W.D. Pa. June 27, 2013); <u>see</u> <u>also</u> <u>Reynolds v. Ellingsworth</u>, 843 F.2d 712, 714 n.1 (3d Cir. 1988). Accordingly, in reviewing this petition, the court takes judicial notice of the publicly available dockets of criminal and collateral post-conviction proceedings in the Court of Common Pleas of Luzerne County, the Superior Court of Pennsylvania, and the Supreme Court of Pennsylvania.

[2] On May 28, 2004, Gacha's co-defendant, Daniel Kukucha, was arrested. (Doc. 35-1 at 70 n.1, <u>Commonwealth v. Gacha</u>, No. 1821 MDA 2006). On June 22, 2004, while awaiting trial, Kukucha committed suicide in prison. (<u>Id.</u>)

On September 8, 2006, a jury found Gacha guilty of murder in the first degree, robbery, theft by unlawful taking or disposition, and criminal conspiracy to commit robbery. (See Doc. 35-1 at 11, Commonwealth v. Gacha, No. 2578-2004 (Luzerne Cty. Ct. Com. Pl.)). On September 12, 2006, during the penalty phase, the court imposed a life sentence after the jury was unable to reach a unanimous verdict on the death penalty. (See id.) Gacha was also sentenced to consecutive sentences of ten (10) to twenty (20) years' imprisonment on the robbery and criminal conspiracy to commit robbery charges. (See id.)

Gacha filed a timely direct appeal. On March 24, 2008, the Pennsylvania Superior Court affirmed the judgment of sentence, and on May 13, 2009, the Pennsylvania Supreme Court denied the petition for allowance of appeal. (Doc. 35-1 at 69-87, Commonwealth v. Gacha, No. 1821 MDA 2006 (Pa. Super. 2006); Doc. 35-1 at 162, Commonwealth v. Gacha, No. 733 MAL 2008 (Pa. 2008)).

On May 9, 2012, Gacha filed a timely *pro se* petition for post-conviction collateral relief pursuant to the Post Conviction Relief Act ("PCRA"), 42 PA. CONS. STAT. §§ 9541-46. (Doc. 31-4 at 6-29, PCRA Petition). Counsel was subsequently appointed and filed a supplemental petition and supporting brief. (Doc. 35-1 at 182-88). On June 27, 2011, the PCRA court denied the petition. (Doc. 35-1 at 165-181, PCRA Opinion and Order dated June 27, 2011). Gacha filed a timely notice of appeal to the Pennsylvania Superior Court. On June 27, 2012, the Pennsylvania Superior Court affirmed the PCRA court's order denying the petition. (Doc. 35-1 at 246-56, Commonwealth v. Gacha, No. 1373 MDA 2011 (Pa. Super. 2011)). Gacha filed a petition for allowance of appeal with the Pennsylvania Supreme Court. On

December 24, 2012, the Pennsylvania Supreme Court denied the petition for allowance of appeal. (Doc. 35-1 at 259, Pennsylvania Supreme Court Order Denying Petition for Allowance of Appeal, No. 637 MAL 2012 (Pa. 2012)).

On January 14, 2013, Gacha filed a second PCRA petition. (Doc. 45 at 66-77, Second PCRA Petition, Supplement, and Amended Supplement). On June 1, 2015, the PCRA court granted Gacha's motion to withdraw the PCRA petition. (Doc. 45 at 91).

Gacha filed the instant petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Doc. 1).

## III. Standards of Review

The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). A habeas corpus petition pursuant to § 2254 is the proper mechanism for a prisoner to challenge the "fact or duration" of his confinement. Preiser v. Rodriguez, 411 U.S. 475, 498-99, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973). "[I] t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). Rather, federal habeas review is restricted to claims based "on the ground that [petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); Estelle, 502 U.S. at 68.

## A.       Exhaustion

Habeas corpus relief cannot be granted unless all available state remedies

have been exhausted, or there is an absence of available state corrective process, or

circumstances exist that render such process ineffective to protect the rights of the

applicant.  See 28 U.S.C. § 2254(b)(1).  The exhaustion requirement is grounded on

principles of comity in order to ensure that state courts have the initial opportunity

to review federal constitutional challenges to state convictions.  See Werts v.

Vaughn, 228 F.3d 178, 192 (3d Cir. 2000).

A state prisoner exhausts state remedies by giving the "state courts one full

opportunity to resolve any constitutional issues by invoking one complete round of

the State's established appellate review process."  O'Sullivan v. Boerckel, 526 U.S.

838, 845, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999).[3]  Respect for the state court system

requires that the petitioner demonstrate that the claims in question have been

"fairly presented to the state courts."  Castille v. Peoples, 489 U.S. 346, 351, 109 S.Ct.

1056, 103 L.Ed.2d 380 (1989).  To "fairly present" a claim, a petitioner must present

its "factual and legal substance to the state courts in a manner that puts them on

notice that a federal claim is being asserted."  McCandless v. Vaughn, 172 F.3d 255,

261 (3d Cir. 1999); see also Nara v. Frank, 488 F.3d 187, 197-98 (3d Cir. 2007)

(recognizing that a claim is fairly presented when a petitioner presents the same

---

[3] In Pennsylvania, pursuant to Order 218 of the Pennsylvania Supreme
Court, review of criminal convictions and post-conviction relief matters from the
Pennsylvania Supreme Court is discretionary and "unavailable" for purposes of
exhausting state court remedies under § 2254.  Lambert v. Blackwell, 387 F.3d 210,
233 (3d Cir. 2004).  Thus, to exhaust state remedies, a Pennsylvania prisoner need
appeal only to the Pennsylvania Superior Court.

factual and legal basis for the claim to the state courts).  While the petitioner need

not cite "book and verse" of the federal Constitution, <u>Picard v. Connor</u>, 404 U.S. 270,

278, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971), he must "give the State 'the opportunity to

pass upon and correct' alleged violations of its prisoners' federal rights" before

presenting those claims here, <u>Duncan v. Henry</u>, 513 U.S. 364, 365, 115 S.Ct. 887, 130

L.Ed.2d 865 (1995) (quoting <u>Picard</u>, 404 U.S. at 275, 92 S.Ct. 509).

### B.  Merits Standard

Once a court has determined that the exhaustion requirement is met and,

therefore, that review on the merits of the issues presented in a habeas petition is

warranted, the scope of that review is set forth in 28 U.S.C. § 2254(d).  Section

2254(d) provides, in pertinent part, that an application for a writ of habeas corpus

premised on a claim previously adjudicated on the merits in state court shall not be

granted unless:

> (1) [the decision] was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the
> Supreme Court of the United States; or
>
> (2) [the decision] was based on an unreasonable determination of the
> facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  To establish that the decision was contrary to federal law "it is

not sufficient for the petitioner to show merely that his interpretation of Supreme

Court precedent is more plausible than the state court's; rather, the petitioner must

demonstrate that Supreme Court precedent requires the contrary outcome."

<u>Matteo v. Superintendent</u>, 171 F.3d 877, 888 (3d Cir. 1999).  Similarly, a federal court

will only find a state court decision to be an unreasonable application of federal law

if the decision, "evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent." Id.

Further, under 28 U.S.C. § 2254(e)(1), a federal court is required to presume that a state court's findings of fact are correct. A petitioner may only rebut this presumption with clear and convincing evidence of the state court's error. Miller-El v. Cockrell, 537 U.S. 322, 341 (2003) (stating that the clear and convincing standard in § 2254(e)(1) applies to factual issues, whereas the unreasonable application standard of § 2254(d)(2) applies to factual decisions); Matteo, 171 F.3d at 888; Thomas v. Varner, 428 F.3d 491, 497-98 (3d Cir. 2005). This presumption of correctness applies to both explicit and implicit findings of fact. Campbell v. Vaughn, 209 F.3d 280, 286 (3d Cir. 2000). Consequently, a habeas petitioner "must clear a high hurdle before a federal court will set aside any of the state court's factual findings." Mastracchio v. Vose, 274 F.3d 590, 597-98 (1st Cir. 2001).

Like the "unreasonable application" prong of paragraph (1), a factual determination should be adjudged "unreasonable" under paragraph (2) only if the court finds that a rational jurist could not reach the same finding on the basis of the evidence in the record. 28 U.S.C. § 2254(d)(2); Porter v. Horn, 276 F. Supp. 2d 278, 296 (E.D. Pa. 2003); see also Torres v. Prunty, 223 F.3d 1103, 1107-08 (9th Cir. 2000); cf. Jackson v. Virginia, 443 U.S. 307, 316 (1979). "This provision essentially requires the district court to step into the shoes of an appellate tribunal, examining the record below to ascertain whether sufficient evidence existed to support the findings of fact material to the conviction." Breighner v. Chesney, 301 F. Supp. 2d

354, 364 (M.D. Pa. 2004) (citing 28 U.S.C. § 2254(d)(2) and (f)[4]).  Mere disagreement with an inferential leap or credibility judgment of the state court is insufficient to permit relief.  Porter, 276 F. Supp. 2d at 296; see also Williams v. Taylor, 529 U.S. 362, 408-09 (2000); Hurtado v. Tucker, 245 F.3d 7, 16 (1st Cir. 2001).  Only when the finding lacks evidentiary support in the state court record or is plainly controverted by evidence therein should the federal habeas court overturn a state court's factual determination.  Porter, 276 F. Supp. 2d at 296; see also Williams, 529 U.S. at 408-09.

## IV.   Discussion

In the instant petition, Gacha argues that the trial court erred in failing to suppress statements that were a product of a coercive environment in violation of the Fifth Amendment privilege against self-incrimination, and additionally, that his Miranda waiver was not knowingly and voluntarily made because he was under the influence of drugs or alcohol.  (Docs. 1, 2).  Gacha also sets forth several claims of ineffective assistance of trial counsel.  (Id.)

### A.    Claim of Trial Court Error for Failure to Suppress Statements

Gacha contends that the trial court erred in failing to suppress his statements because law enforcement officials engaged in coercive behavior that made his statements not truly voluntary.  He further argues that his statements to law enforcement officials were not made after a knowing and voluntary waiver of his Miranda rights.  The court finds that the state court's refusal to suppress Gacha's

---

[4]  "If the applicant challenges the sufficiency of the evidence adduced in such State court proceeding to support the State court's determination of a factual issue made therein, the applicant, if able, shall produce that part of the record pertinent to a determination of the sufficiency of the evidence to support such determination."  28 U.S.C. § 2254(f).

statements did not violate his rights under the Fifth Amendment, and thus was not contrary to, or an unreasonable application of, clearly established federal law.

The Fifth Amendment of the United States Constitution protects an individual from self-incrimination.  U.S. CONST. amend. V.  The Fourteenth Amendment incorporates the Fifth Amendment privilege against self-incrimination to the states.  See Malloy v. Hogan, 378 U.S. 1, 8 (1964).  The prosecution may not use any statements stemming from a custodial interrogation unless the individual is first informed of his right to remain silent, that any statement made may be used as evidence against him, and that he has a right to an attorney.  See Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).  An individual may waive these, provided the waiver is made voluntarily, knowingly, and intelligently. Id.  Absent a voluntary waiver of these rights, a confession taken during a custodial interrogation violates the privilege against self-incrimination.  See Thompson v. Keohane, 516 U.S. 99 (1995).

Gacha argues that his conviction was obtained by use of a coerced confession based on a promise made by law enforcement officers.  In addition, Gacha contends that he was under the influence of drugs or alcohol to such an extent that he did not knowingly and voluntarily waive his Miranda rights.  (Doc. 1 at 8).  When evaluating whether the waiver of Miranda's protections was voluntary, the court must consider two elements.  First, a suspect's waiver must be voluntary in the sense that it is the "product of an essentially free and unconstrained choice by its maker."  United States v. Swint, 15 F.3d 286, 289 (3d Cir. 1994).  Second, the waiver must be "made with a full awareness of both the nature of the right being abandoned and the

9

consequences of the decision to abandon it." Berghuis v. Thompkins, 560 U.S. 370,

371 (2010) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)).  To determine if a

confession was voluntary and whether a party knowingly waived his rights, the

Supreme Court requires consideration of "the totality of all the surrounding

circumstances—both the characteristics of the accused and the details of the

interrogation." Dickerson v. United States, 530 U.S. 428, 434 (2000) (citations

omitted).

The Supreme Court has held that a statement or confession is involuntary

when the suspect's "will was overborne in such a way as to render his confession

the product of coercion." Arizona v. Fulminante, 499 U.S. 279, 288 (1991).  However,

a lack of evidence regarding an officer's use of coercive tactics similarly impacts a

voluntariness analysis.  See United States v. Jacobs, 431 F.3d 99, 108 (3d Cir. 2005)

("A necessary predicate to a finding of involuntariness is coercive police activity.").

"The ultimate issue of voluntariness is a legal question requiring an

independent federal determination." Lam v. Kelchner, 304 F.3d 256, 264 (3d Cir.

2002) ("[U]nder the AEDPA habeas standard, we are required to determine whether

the state court's legal determination of voluntariness was contrary to or an

unreasonable application of Supreme Court precedent.") (citing Miller v. Fenton,

474 U.S. 104, 110 (1985)).  Determinations of factual issues by state courts, such as

whether police used intimidation tactics, are given a presumption of correctness,

which may be rebutted by clear and convincing evidence to the contrary.  See

Miller, 474 U.S. at 112 (a state court's findings on subsidiary questions in

determining voluntariness of a confession are conclusive on habeas review absent

clear and convincing evidence to the contrary); <u>see</u> <u>also</u> <u>Sweet v. Tennis</u>, 386 F.

App'x 342, 345 (3d Cir. 2010). Thus, the court must examine the facts surrounding

Gacha's confession in order to determine if the state court's holding was contrary

to, or an unreasonable application of, clearly established federal law.

Gacha raised the issues of a coerced confession, and that the <u>Miranda</u> waiver

was not knowingly and voluntarily made, on direct appeal. In addressing this claim,

the Pennsylvania Superior Court found as follows:

> In his fourth issue, [Gacha] claims that the trial court erred in denying
> his motion to suppress these statements. [Gacha] contends that the
> police did not advise him of his <u>Miranda</u> rights, and the influence of
> alcohol and drugs rendered him incapable of intelligently, knowingly
> and voluntarily waiving his right to silence. <u>See</u> <u>Miranda v. Arizona</u>,
> 384 U.S. 426 (1966).
>
> This Court's standard of review for the denial of a suppression motion
> is well-settled:
>
>> [The] standard of review in addressing a challenge to a
>> trial court's denial [or grant] of a suppression motion is
>> whether the factual findings are supported by the record
>> and whether the legal conclusions drawn from these facts
>> are correct. When reviewing rulings of a suppression
>> court, we must consider only the evidence of the
>> prosecution and so much of the evidence for the defense
>> as remains uncontradicted when read in the context of
>> the record as a whole. Where the record supports the
>> findings of the suppression court, we are bound by those
>> facts an [sic] may reverse only if the legal conclusions
>> drawn therefrom are in error.
>
> <u>Commonwealth v. Colon</u>, 777 A.2d 1097, 1100 (Pa. Super. 2001), <u>quoting</u>
> <u>Commonwealth v. Hawkins</u>, 701 A.2d 492, 504-505 (Pa. 1997)
>
> As a general rule, the prosecution may not use statements, whether
> inculpatory or exculpatory, stemming from a custodial interrogation of
> a defendant unless it demonstrates that he was apprised of his right
> against self-incrimination and his right to counsel. <u>See</u> <u>Miranda</u>, 384
> U.S. at 444. "Interrogation" is defined as "questioning initiated by law

enforcement officials." <u>Commonwealth v. DeJesus</u>, 787 A.2d 394, 401 (Pa. 2001), <u>cert. denied</u>, 537 U.S. 1028 (2002) (citation omitted). A person is in custody for <u>Miranda</u> purposes when he "is physically denied his freedom of action in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by the interrogation." <u>Commonwealth v. Johnson</u>, 727 A.2d 1089, 1100 (Pa. 1999).

> A defendant may waive his <u>Miranda</u> rights, and agree to answer questions or make a statement. For a waiver to be valid, it must be knowing, voluntary, and intelligent. In other words, the waiver must be 'the product of a free and deliberate choice rather than intimidation, coercion, or deception,' and 'must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.'

<u>DeJesus</u>, 787 A.2d at 402 (citations omitted).

In this case, [Gacha's] statements were made during a custodial interrogation, as [Gacha] was under arrest and being questioned by the police about Martin's murder when he gave them. Therefore, <u>Miranda</u> warnings were in order.

The trial court found that [Gacha] was given his <u>Miranda</u> rights, and that he waived them. In this regard, the record shows that Detective Sworen, one of the detectives who interrogated [Gacha], testified that [Gacha's] <u>Miranda</u> rights were read to him before his interrogation began, and that [Gacha] signed two forms, one acknowledging that he received them and the second, stating that he waived them. The Detective further testified that his observations of [Gacha] confirmed that he showed no signs of intoxication. Accordingly, we conclude that the record supports the findings that [Gacha] was apprised of his <u>Miranda</u> rights, and knowingly, voluntarily, and intelligently waived his right against self-incrimination. Therefore, we also conclude that the trial court's denial of [Gacha's] motion to suppress was proper.

(Doc. 35-1 at 81-83, <u>Commonwealth v. Gacha</u>, No. 1821 MDA 2006 (footnote

omitted)).

The court has considered the facts in support of Gacha's claim that his

confession was involuntary and coerced, and finds that he has not established that

the state court conclusion resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law. Nor has he established that the proceedings resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. The facts show that Gacha's treatment during the interrogation was reasonable, did not present an intimidating or coercive environment, and was not unduly lengthy. See Jacobs, 431 F.3d at 108. Nothing in the record suggests that Gacha's statements were not voluntary. Gacha was picked up by police on June 2, 2004 at approximately 8:30 a.m. - 9:00 a.m., and transported to the State Police Barracks for questioning. (Doc. 35-2 at 127-28, Trial Transcript ("Trial Tr.") 488:8-489:7, September 5, 2006). Gacha's interview began on June 2, 2004 at 10:20 a.m., with the administration of Miranda rights and warnings. (Doc. 35-2 at 127-28, Trial Tr. 490:15-490:24; Doc. 35-1 at 154, Commonwealth v. Gacha, No. 2758 of 2004, Pa.R.A.P. 1925(a) Opinion). Gacha was interviewed by only three officers, and was provided with beverages. (Doc. 35-2 at 127, Trial Tr. 488:17-489:19). At 1:05 p.m., Gacha provided a written statement, prior to which he was again given Miranda rights and warnings. (Doc. 35-2 at 127-28, Trial Tr. 490:25-492:19). Thus, the record reflects that Gacha was warned of his Miranda rights both orally and in writing, and he signed a written acknowledgement and waiver of those rights. There is no evidence to suggest that Gacha was physically harmed or threatened, there is no testimony that he was deprived of food, water, or other physical needs, and there is no indication that the police used unnecessary or overbearing psychological tactics to obtain an incriminating statement from him. Indeed, Gacha does not allege that

13

the environment was intimidating. Instead, he asserts that the alleged promise to see his fiancé at the conclusion of the interrogation was the reason behind his confession. (Doc. 1 at 8). Additionally, there is no evidence that Gacha was under the influence of drugs or alcohol such that he did not comprehend his <u>Miranda</u> rights. The detective testified that Gacha showed no signs of intoxication during questioning. (Doc. 35-2 at 146, Trial Tr. 565:19-566:19). Gacha has not provided clear and convincing evidence that his "will was overborne in such a way as to render his confession the product of coercion." <u>Fulminante</u>, 499 U.S. at 288. For these reasons, the court will deny the habeas petition as to this claim.

**B.    Ineffective Assistance of Counsel Claims**

The Sixth Amendment right to counsel is the right to the effective assistance of counsel. <u>Strickland v. Washington</u>, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). This right to effective assistance of counsel also extends to the first appeal. <u>Lewis v. Johnson</u>, 359 F.3d 646, 656 (3d Cir. 2004). In <u>Strickland</u>, the Supreme Court articulated a two-prong test in assessing whether a petitioner has been denied the effective assistance of counsel. <u>Strickland</u>, 466 U.S. at 687-88. A petitioner must demonstrate: (1) that his counsel's representation "fell below an objective standard of reasonableness" and (2) that such defective performance caused the petitioner prejudice. <u>See</u> <u>id.</u>

In evaluating the first prong of the <u>Strickland</u> test, the court must be "highly deferential" toward counsel's conduct. <u>Id.</u> at 689. There is a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. <u>Id.</u> ("It is all too tempting for a defendant to second-guess counsel's

assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."). "Strickland and its progeny make clear that counsel's strategic choices will not be second-guessed by post-hoc determinations that a different trial strategy would have fared better." Rolan v. Vaughn, 445 F.3d 671, 681-82 (3d Cir. 2006) (citing Strickland, 446 U.S. at 689). Notably, courts will not deem counsel ineffective for failing to raise a meritless argument. Strickland, 466 U.S. at 691; United States v. Saunders, 165 F.3d 248, 253 (3d Cir. 1999).

To satisfy the prejudice prong, the petitioner must show that there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. See Strickland, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. Moreover, the petitioner must show that he or she had a reasonable likelihood of prevailing on the motion at issue, and having prevailed on the motion, it was also reasonably likely that the result of the trial would have been different. See Thomas, 428 F.3d at 502.

To prevail on a claim for ineffective assistance of counsel, a petitioner must satisfy both prongs of the Strickland test. Carpenter v. Vaughn, 296 F.3d 138, 149 (3d Cir. 2002). The inquiry may begin with either the deficient performance or prejudice prong, and the court is not required to consider the second prong of the test if the petitioner is unable to satisfy the first one. Strickland, 466 U.S. at 697.

## 1.    *Failure to Hire a Forensic Expert*

Gacha argues that his trial attorneys were ineffective for failing to hire a

forensic expert to provide assistance on cross-examination of the Commonwealth's

experts, or to test the evidence in his case.  (Doc. 2 at 11-14).  The Superior Court

rejected this claim on Gacha's PCRA appeal and found as follows:[5]

> [Gacha's] first issue is that his counsel were ineffective for failing to
> hire one or more forensic experts to test some or all of the physical
> evidence involved in this case.  The evidence included hair, cigarettes
> and semen found at the location where the decedent was stabbed and
> killed.  The Commonwealth tested that evidence and did not find
> [Gacha's] DNA thereon.  The Commonwealth did find [Gacha's]
> blood/DNA on a door at the scene.  Other physical evidence included
> clothing found at a dumpsite.  The Commonwealth contended that
> [Gacha] owned and wore the clothing during the killing.  DNA from
> [Gacha] and the decedent were found on that clothing.
>
> [Gacha's] position is that, had his counsel hired experts, perhaps to
> conduct DNA tests, the experts could have presented their own
> defensive evidence and/or could have helped [Gacha's] trial counsel
> cross examine the Commonwealth's witnesses.
>
> At the PCRA hearing, [Gacha] did not call expert witnesses.  As such,
> he offered no expert testimony providing any arguable reason to
> believe experts could have conducted some type of tests that would
> have been helpful to him at trial.
>
> [Gacha] did offer his own lay testimony along the following lines:
>
> > Well, the forensic expert could have cross examined the
> > findings of DNA and whatnot from the crime scenes or

---

[5] The PCRA court concluded that Gacha's "allegations of trial counsel's
ineffectiveness fail miserably."  (Doc. 35-1 at 173, Commonwealth v. Gacha, No. 2758
of 2004, PCRA Opinion).  On appeal from the PCRA court, the Pennsylvania
Superior Court affirmed the PCRA court's order with regard to each of Gacha's
allegations in support of PCRA relief, and concluded that the record did not support
any of the ineffectiveness claims.  (Doc. 35-1 at 246-56, Commonwealth v. Gacha, No.
1373 MDA 2011, June 27, 2012 Memorandum (Pa. Super. 2011)).  The Pennsylvania
Superior Court memorandum will be the primary reference point in addressing the
ineffectiveness claims in the instant habeas petition.  (Id.)

various witness statements. The expert could have
basically challenged any of the Commonwealth's findings.

N.T., 03/17/11, at 8.

Also, with particular reference to the clothing, [Gacha] testified:

> The forensic expert . . . could have distanced me from it
> by proving that the other DNA found on the clothing was
> not mine.

Id. at 9.

[Gacha's] for[e]going testimony was nothing more than lay speculation
that some tests by some experts might have somehow helped him. He
offered no evidence supporting this speculation.

Ultimately, the record simply contains no reasons to conclude any
testing, DNA or otherwise, by experts whom [Gacha] has not specified
would have aided [Gacha] in either cross examining the
Commonwealth's witnesses or presenting a defense. As the record
does not establish there would have been arguable merit to hiring
experts for [Gacha], the record cannot establish his ineffectiveness
claim.

(Doc. 35-1 at 248-50, Commonwealth v. Gacha, No. 1373 MDA 2011 (footnote

omitted)).

The state courts determined that this claim lacked arguable merit. Gacha did

not provide any evidence that such a forensic expert existed, was available to testify

at trial and, most importantly, would have provided testimony that would have

altered the outcome of the trial. The states courts determined that Gacha's bald

statements regarding a hypothetical expert would not have sufficed to prevail on

this claim on the merits and, thus, counsel were not ineffective for failing to retain a

forensic expert. Moreover, the state courts noted that defense counsel did retain

two forensic experts prior to trial, and both indicated that they could provide no

assistance.  (Doc. 25-1 at 176-77).  Upon review, the state courts' determination that

counsel's performance was not deficient is not an unreasonable application of

Strickland.  See Zettlemoyer v. Fulcomer, 923 F.2d 284, 298 (3d Cir. 1991) (a

petitioner "cannot meet his burden to show that counsel made errors so serious

that his representation fell below an objective standard of reasonableness based on

vague and conclusory allegations that some unspecified and speculative testimony

might have established his defense.  Rather, he must set forth facts to support his

contention.").  Therefore, the court will deny the habeas petition as to this claim.

### 2. *Failure to Hire a Private Investigator*

Gacha alleges that trial counsel were ineffective for failing to promptly hire a

private investigator in preparation for trial.  In the context of ineffective assistance

based on counsel's failure to investigate, the court must determine whether counsel

exercised "reasonably professional judgment."  Jacobs v. Horn, 395 F.3d 92, 102 (3d

Cir. 2005) (quoting Wiggins v. Smith, 539 U.S. 510, 522-23 (2003)).  To show

prejudice, Gacha must show that counsel's failure to investigate deprived him of a

fair trial.  Strickland, 466 U.S. at 687, 694.

The Pennsylvania Superior Court addressed this claim as follows:

> [Gacha] also poses an issue that counsel were ineffective in not hiring a
> private investigator until some two years after [Gacha's] arrest.
> [Gacha's] specific point concerning the delay is that counsel should
> have hired an investigator to interview James Burge, Sr., who [Gacha]
> contends owned the premises where the incident occurred.  [Gacha]
> asserts Burge would have told an investigator that he, not a robber or
> robbers, removed certain personalty from the incident scene.  [Gacha]
> thus believes interviewing Burge would have helped [Gacha] challenge
> the robbery charge.  That is, [Gacha] essentially claims the interview
> would have produced a[] [Gacha]-favorable statement from Burge
> indicating Burge removed the items in question.  According to

[Gacha], however, Burge died during the two-year interim between [Gacha's] arrest and the time counsel did hire an investigator. Thus, no investigator interviewed Burge on [Gacha's] behalf.

Based on [Gacha's] account of the facts relevant to this particular issue, Burge could not have testified at the time of the trial. He was dead. Thus, even if counsel had hired an investigator before Burge's death, and even if the investigator had interviewed Burge, and even if Burge had told the investigator that he (Burge) had removed the allegedly stolen items from the scene, Burge's statement would likely have been inadmissible as hearsay at trial. See Pa.R.E. 801-02; 804. We recognize there are circumstances where statements of deceased witnesses may be admissible, see Pa.R.E. 804, but nothing in the record suggests the interview [Gacha] now advocated would have satisfied Rule 804, even assuming the interview yielded [Gacha]-favorable content. Accordingly, the record does not show the failure to interview Burge would have impacted this trial at all. Consequently, the record does not lead to the conclusion that the failure to interview Burge resulted in any prejudice to [Gacha].

(Doc. 35-1 at 250-51).

The state courts' resolution of this ineffectiveness claim is neither contrary to, nor an unreasonable application of, <u>Strickland</u>. The state courts noted that defense counsel did hire a private investigator, and even if counsel hired an investigator before Burge's death, he could not have testified at the time of the trial because he passed away before trial began. Thus, the state courts found that Burge's statement would likely have been inadmissible hearsay at trial. The state courts further found that the failure to interview Burge had no impact on Gacha's trial at all, and did not result in any prejudice to Gacha. Even if counsel were deemed to have been deficient in waiting two years to obtain a private investigator, it is difficult to conceive how the statement of a deceased person would have been admitted at trial and changed the outcome of the trial. Gacha failed to establish that the proceedings resulted in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in the state court proceedings. As a result, the court will deny habeas relief on this ineffectiveness claim.

### 3. *Failure to Cross-Examine Gacha's stepbrother about "bad blood" between them*

Gacha contends that his stepbrother had a motive to lie about Gacha's admission to the homicide, and trial counsel failed to cross-examine his stepbrother about the purported bad blood between them.

"[C]ourts generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel." Dell v. Straub, 194 F. Supp.2d 629, 651 (E.D. Mich. 2002); see Fugate v. Head, 261 F.3d 1206, 1219 (11th Cir. 2001); Dows v. Wood, 211 F.3d 480, 489 (9th Cir. 2000). Counsel's approach to impeachment is a tactical decision and "such decisions do not constitute deficient conduct simply because there are better options." Reynoso v. Giurbino, 462 F.3d 1099, 1113 (9th Cir. 2006). However, if a witness "had a strong reason to lie, and testify in a manner that would help the prosecutor, in the hopes of getting favorable treatment from the Commonwealth, that establishes the potential bias that would [constitute] compelling impeachment evidence" because such information would benefit a jury in assessing the reliability of such a witness. Grant v. Lockett, 709 F.3d 224, 236 (3d Cir. 2013). Notably, counsel's impeachment strategy is not ineffective unless the "defendant [can] overcome the presumption that, under the circumstances, the challenged action [or lack of action] 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 689 (citation omitted).

Review of the trial transcript reveals that on cross-examination, defense counsel failed to explore the issue of "bad blood" with Gacha's stepbrother. When questioned at the PCRA hearing about the strategical approach to the cross examination and impeachment of Gacha's stepbrother, trial counsel responded as follows:

Q.     Mr. Pike, one final matter. Mr. Gacha said that he had bad blood with his brother, Chris, and the defense did not attempt to cross examine Mr. Howell with regard to that bad blood.

        Let me ask you this: Mr. Howell testified on your behalf, didn't he?

A.     Yes. He testified in the merits case for the Commonwealth, but he also stepped up and testified in the mitigation phase, the penalty phase, of the trial.

Q.     And he wept there?

A.     Absolutely. And at the end he asked, and the Court him [sic], granted permission for him and Joe to spend time together in the courtroom.

Q.     If I recall correctly, he said that he loved his brother?

A.     Yes.

Q.     And that they didn't have a perfect relationship?

A.     When we confronted Joe before the trial began, and told him these are the Commonwealth witnesses specifically, Kevin, your mom, your brother. Joe – and that they're going to testify, Joe told me that it was his firm belief that these people wouldn't come in and testify against him. He was confident they wouldn't testify against him.

        I have a recollection, in the trial, I can't remember who testified first, if it was brother, his mother or Heather, but after their testimony, I do have a recollection of talking to Joe at counsel table, and I said, Joe, they're here, you heard what happened,

maybe it's not too late to try and work a plea, they're here to testify, you just saw what happened. He wanted to proceed.

Q. Did you make a strategic decision, Mr. Pike, not to inquire as to whether or not Mr. Howell had any bad blood?

A. We did. Ultimately Mr. Howell agreed to meet with the private investigator. The private investigator had gone out a couple of times to see him. And for scheduling issues, they just couldn't meet. And I know Mr. Harris did meet with him at some point in time.

I never met Mr. Howell until trial. A face to face, pretrial conference was done with him and Mr. Harris, but in the report it addresses the issue. Mr. Harris made a recommendation to me, based on his experience, that this man is going to testify. Mr. Howell will testify, and he seems very knowledgeable and confident in the factual basis of his testimony for the Commonwealth.

I don't recall what page that's written on. Mr. Harris can elaborate on that.

Q. You did cross examine Mr. Howell extensively, correct, Mr. Pike?

A. Yes.

Q. And you discussed specifically any inaccuracies, and you attempted to point out his contentions in his testimony?

A. Yes.

Q. Just so we're clear, there's approximately 16 pages of testimony where you were cross examining Mr. Howell?

A. I don't recall.

Q. I'm submitted there are approximately 16 pages where you did cross examine him, as to whether or not he required this bad blood of the relationship between he and Mr. Gacha. Was there a strategic position made –

A.    I had no knowledge of that. And that was – not having met the man prior to testimony, the investigation through Mr. Harris did not reveal there was any sort of bad blood.

But yet Mr. Harris met with Mr. Gacha, both with me at the prison, sometimes on his own.

(Doc. 35-2 at 221-22, PCRA Transcript ("PCRA Tr.") 61:20-64:16, March 17, 2011).

The state courts concluded that this ineffectiveness claim could not succeed because there was no reasonable probability that impeaching his stepbrother would have likely changed the outcome of the trial. The Pennsylvania Superior Court found as follows:

[Gacha's] remaining issue involves his stepbrother who testified at trial that [Gacha] admitted killing the decedent. [Gacha] contends he and his stepbrother had a history of enmity stemming from jealousies and/or competition for jobs, family respect, friends, and girlfriends. [Gacha] further asserts that he told his counsel about this "bad blood" and that counsel should have cross examined the stepbrother on this point to demonstrate his bias and prejudice, thereby undermining the stepbrother's credibility and weakening the Commonwealth's case.

[Gacha's] PCRA testimony provided some evidence of the aforesaid enmity and arguable bias or prejudice. Although the PCRA court and current counsel seem to conclude counsel neither knew nor should have known about the claimed bias/prejudice, it is not clear to us that the record supports their position. It is clear counsel did not cross examine the stepbrother about any animosity between him and [Gacha]. Nevertheless, [Gacha's] ineffectiveness claim cannot succeed because there is no reasonable probability that impeaching his stepbrother would have likely changed the outcome of the trial.

More specifically, the trial evidence included, *inter alia*, the following. [Gacha's] statement to police placed him at the scene during the killing. In that statement, [Gacha] claimed it was his codefendant who initially stabbed the decedent and [Gacha] stated that he grabbed the decedent to hold her back when she tried to grab the codefendant.

[Gacha's] statement also indicated that, while he believed the codefendant's repeated acts of stabbing the decedent and stomping on her head had killed her, [Gacha] stabbed her three times in the back to

ensure she was dead and was no longer suffering. The statement further indicated [Gacha] took an X-box, a lockbox and a DVD player from the decedent's residence.

[Gacha's] girlfriend testified to a somewhat different statement he made. She indicated he told her he was the one who killed the decedent.

Chrisdee Harvey, the girlfriend of [Gacha's] codefendant, testified that, when she asked [Gacha] whether he knew about the instant murder, he said, "I know a lot about it. I did it." N.T., 09/05/06, at 231.

[Gacha's] blood was found at the scene. His DNA and that of the decedent were found on clothing that had been discarded in a dumpsite not far from the location of the killing.

Given the foregoing evidence, the record does not demonstrate any reasonable probability of a different verdict, even if the stepbrother's testimony had been impeached by showing he had some bias or prejudice against [Gacha].

(Doc. 35-1 at 254-56).

In evaluating whether counsels' performance was deficient, the court must defer to counsels' tactical decisions, avoid "the distorting effects of hindsight" and give counsel the benefit of a strong presumption of reasonableness. Strickland, 466 U.S. at 689. The court finds that the record relied upon by the Superior Court supports a finding that trial counsel was not ineffective for failing to pursue this line of questioning on cross-examination. Gacha has not provided sufficient evidence to show that the representation by his trial counsel falls "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 689-90. Additionally, Gacha has not demonstrated that there was a reasonable probability that if his trial counsel had cross-examined his stepbrother about some subjective discord in their

24

relationship, the result would have been different.  Consequently, the habeas petition will be denied on this ground.

### 4. *Failure to Obtain Phone Records*

Gacha alleges that Chrisdee Hardee, the co-defendant's girlfriend, misrepresented that Gacha called her and admitted to the murder.  He contends that trial counsel were ineffective for failing to obtain records of the phone conversation.  The Pennsylvania Superior Court rejected this ineffectiveness claim as follows:

> [Gacha's] next issue is that counsel were ineffective for not obtaining and using certain telephone records.  More particularly, the claim is that counsel should have utilized [Gacha's] records and/or Chrisdee Harvey's records.  Along these lines, [Gacha] asserts Harvey testified at trial that [Gacha] called her and admitted killing the decedent. [Gacha] believes phone records would have shown he made no such call.

> [Gacha] did not introduce phone records at the PCRA hearing. Because he did not do so, he did not establish those records would have arguably helped him in the way he contends.  Thus, the record does not demonstrate arguable merit to the underlying claim that counsel should have obtained and used such records.

(Doc. 35-1 at 250).

The state courts determined that because Gacha failed to establish that the phone records existed, trial counsel could not be deemed ineffective for failing to present information which ostensibly did not exist.  See, e.g., Commonwealth v. Williams, 602 A.2d 350, 357-58 (Pa. Super. 1992) ("[A]ppellant's failure to establish that the photographs exist is sufficient grounds to deny his claim [that trial counsel was ineffective for failing to place the photographs into evidence].").  Because counsel cannot be deemed ineffective for failing to pursue a meritless claim, the

court concludes that Gacha has failed to identify any decision of the trial court or appellate court which is contrary to, or an unreasonable application of, clearly established federal law. Thus, Gacha failed to meet his burden of proving ineffective assistance of counsel on this claim, and the court will deny habeas relief on this ground.

### 5. *Failure to raise the mental health issues and use of prescription drugs by Gacha's mother*

Gacha contends that trial counsel rendered ineffective assistance by failing to investigate the mental health issues and use of prescription drugs by his mother. During the PCRA hearing, trial counsel testified regarding this issue as follows:

> Q. Let's talk about some of the witnesses. Mr. Gacha believes his mother had some mental infirmities that were not addressed. With regard to the Cross Examination of Jacqueline Gacha, can you tell us what considerations were made with regard to her Cross Examination?
>
> A. I never met her until the time of trial, until she appeared at trial. I know the investigator had tried to contact her. Our mitigation expert had some dealings with her.
>
> I can tell you that between myself, what I saw when she testified and by the private investigator and the mitigation expert, there may have been a mental health issue, but nothing that, in my opinion, would give rise to some sort of psychological issue to challenge her credibility to testify.
>
> Her mental status did become an issue in the mitigation phase, given the environment that Joe grew up in.
>
> Q. With regard to the factual contentions at this point, do you feel or did you make a decision not to cross examine her with regards to her mental – any and all mental infirmities?
>
> A. We didn't have anything specific to put our hands on. It was just one of those things, why is the mother of this individual coming – so eager to come forward and testify against her own child.

We knew some matters for mitigation purposes regarding the
environment, but there was nothing that we could put our finger
on specifically for cross examination purposes.

Q.    Was her factual testimony, the testimony specifically with
      regard to statements that Mr. Gacha made the morning after the
      murder, was it corroborated by other Commonwealth
      witnesses?

A.    Unfortunately, yes.

Q.    Do you recall by how many?

A.    I'm going to say four.

Q.    So the statements that Mrs. Gacha made at the trial were
      corroborated by four other witnesses that the Commonwealth
      called, correct?

A.    Yes.

Q.    So assuming – even if you cross examined her on any mental
      capacity, there was still corroboration with the factual
      allegations, correct?

A.    Half brother, his girlfriend, statements he gave to law
      enforcement, they were all there.

(Doc. 35-2 at 220, PCRA Tr. 56:12-58:7).

      The state courts determined that this claim lack arguable merit.  The

Pennsylvania Superior Court found as follows:

      [Gacha] also claims his counsel should have investigated [Gacha's]
      mother and/or secured a psychiatric evaluation of her to demonstrate
      she had mental health and/or medication issues that would have
      served to impeach her trial testimony.  That testimony arguably
      indicated [Gacha] had admitted killing the decedent.  More
      particularly, [Gacha's] mother testified that he told her he had killed "a
      guy."  N.T., 09/05/06, at 312.  The mother also then explained that
      [Gacha's] girlfriend was present when [Gacha] made that statement.
      According to the mother, the girlfriend responded to [Gacha's]
      statement by saying that [Gacha] had told her it was a girl he had

27

killed.  The mother testified that, when the girlfriend made this remark, [Gacha] "jumped in her face," <u>see</u> <u>id.</u> at 313, and told her, ". . . [S]hut your F'n mouth.  That's what gets me in trouble."  <u>Id.</u>

While [Gacha] contends a psychiatric evaluation or other pretrial investigation would have revealed his mother had some type of mental or medication issue constituting impeachment evidence, he did not call her to testify at the PCRA hearing so that he could demonstrate his contentions about her.  Also, he did not offer the PCRA court any psychiatric or medical evidence on this point.  Thus, the record does not contain evidence demonstrating his claims about her.  Therefore, the record does not reveal any arguable merit to [Gacha's] position that counsel should have investigated [Gacha's] mother and/or had her evaluated.

[Gacha] also suggests counsel should have impeached [Gacha's] mother by showing she had had a history of telling lies, of attempting to place herself in a falsely favorable light, and of favoring certain members of the family over others.  [Gacha's] assertions on this point, and the testimony he provided at the PCRA hearing, are/were amorphous.  He has given virtually no specifics showing the mother had such a history.  Thus, he has not established arguable merit to the claim that counsel could or should have tried to pursue impeachment in the fashion [Gacha] now advocates.

(Doc. 35-1 at 252).

The state courts' assessment of this claim is quite sound, and we find no constitutional infirmity in it.  Indeed, there is little to add to these observations.  Gacha's conclusory statements regarding counsel's failure to obtain psychological testing of his mother does not demonstrate a reasonable probability that the outcome of his proceeding would have been different but for counsel's failure to obtain this testing.  Therefore, the court concludes that the state courts' adjudication of this claim was not contrary to, or an unreasonable application of, clearly established federal law.  As such, the court will deny habeas relief on this claim.

### 6. *Failure to investigate the cause of a cut on Gacha's finger*

Gacha contends that trial counsel were ineffective for failing to investigate the cause of the cut on his finger. The state courts found that Gacha failed to establish any arguable merit to this claim.

During the PCRA hearing, Gacha read the statement he provided to the police pertaining to the cut on his finger. He recited the statement is as follows:

> I reached from behind her, grabbing her face and arm to pull her back. As I did that, she bit me on my finger, middle left, as I let go of her mouth Danny Kakucka [sic] grabbed a knife from his right pocket, stabbed at her with his knife two times, cutting her in the face.

(Doc. 35-2 at 212, PCRA Tr. 24:12-24:16).

The Pennsylvania Superior Court addressed Gacha's statement and ineffectiveness claim as follows:

> [Gacha] contends his counsel should have confirmed [Gacha's] contention that a cut on [Gacha's] finger was caused by an accident and not, as the Commonwealth maintained at trial, by the decedent biting [Gacha] during the incident. More particularly, [Gacha] claims counsel, through some type of expert inspection of photographs of [Gacha's] injury, could have shown the cause thereof was not a bite.
>
> [Gacha] offered no expert testimony during the PCRA hearing demonstrating that some expert inspection of the photos would have revealed that the cause of his finger injury was not a bite from the decedent. Thus, he did not show arguable merit to the claim that counsel should have secured such an inspection.
>
> We note, too, that, at trial, the Commonwealth introduced a pretrial statement made by [Gacha] to a detective. In that statement, [Gacha] offered his explanation of the manner in which the robbery and killing took place, and he admitted he was involved to some extent. In part of his remarks to police, [Gacha] stated that, during the robbery, he grabbed the decedent's face and arm to restrain her from grabbing [Gacha's] codefendant. [Gacha] further explained that, as he did so, the decedent bit him on the finger.

In light of [Gacha's] foregoing statement, as well as additional trial evidence we will discuss *infra*, and in light of [Gacha's] failure, at the PCRA hearing, to offer any [Gacha]-favorable, expert evaluation of the injury photographs, the record does not demonstrate any reasonable probability that engaging in some investigation of the injury photographs would likely have led to a different verdict.

(Doc. 35-1 at 253-54).

Gacha has not demonstrated that trial counsels' failure to investigate another cause of the injury was not sound strategy. The state courts determined that this claim lacked arguable merit, particularly in light of the written statement Gacha provided to police, and noted that trial counsel exhibited a sound and reasonable basis for not pursuing an investigation of the injury. The state courts' determination that counsels' performance was not deficient is not an unreasonable application of clearly established federal law. Gacha has not established that the proceedings resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Thus, Gacha is not entitled to habeas relief on this claim.

### 7. *Clothing found near the location of the homicide*

Gacha alleges that trial counsel were ineffective in failing to adequately address the clothing found at a dumpsite near the location of the homicide. (Doc. 2 at 23-25). Gacha contends that even if the clothing belonged to him, the co-defendant could have been wearing the clothing at the time of the murder.

During the PCRA hearing, Gacha testified about the written statement he provided to police regarding the clothing found at the dumpsite, as follows:

Q.   Mr. Gacha, I'll point to the section I'm talking about here. I'm pointing to the bottom portion of what you've acknowledged is your handwritten statement.

A.   Yes.

Q.   Can you read that portion, please?

A.   "I had on a pair of brown cargo shorts and a gray Tazmanian [sic] Devil t-shirt."

Q.   Okay. So there you're admitting you had on the cargo shorts in your own handwriting, correct?

A.   I wrote that, yeah. I was once – again, I will point out, that statement was coerced.

Q.   Okay. Mr. Gacha, I got it.

A.   I'm just clearing it up. I mean, if you're going to keep bringing the statement up there and having me read what's written on it in my handwriting, I'm not denying it was written in my handwriting. But I'm going to continue to –

Q.   The DNA that was found on the cargo shorts, your DNA, it was found on those shorts, correct?

A.   I believe so, yes.

Q.   Okay. And there were protein enzymes on the inner seams of those shorts, correct?

A.   Correct.

Q.   Were the shorts found there your shorts?

A.   Yes.

Q.   Found at the dump site?

A.   Yes.

Q.   Okay. So it's your testimony today, you were not wearing the shorts that had your DNA, your blood, and that you admitted to

wearing in that handwritten statement, that's your testimony today?

A.    Yes.

(Doc. 35-2 at 212-13, PCRA Tr. 26:23-28:4).

Trial counsel proceeded to testify at the PCRA hearing regarding the clothing at issue, as follows:

Q.    . . . Mr. Gacha's DNA was found on that location, wasn't it?

A.    Yes.

Q.    Where specifically, if you recall?

A.    He had – he said he cut himself.  He'd gotten bit by Miss Martin during the course of the struggle.  He bled there.  I know there was clothing – there was blood on his clothing.  There was Commonwealth evidence to that respect that was testified to by DNA and/or blood make up, serology.

We did what we could to attempt to challenge that on cross examination of those particular witnesses.  But once again, if you recall the photographs of this crime scene, there was blood everywhere, it was a mess.

Once again, Joe had made an admission to us he was in the room.  We knew he was there.  Whether or not – what happened, happened, but he was in that room.  He admitted on the statement he'd got bitten.  It made perfect sense there was going to be some sort of blood left behind by Joe.

In itself, it just puts him in the room at that point in time, it didn't put him as the actor of the murder.

(Doc. 35-2 at 221, PCRA Tr. 60:19-61:16).

Both the PCRA court and the Superior Court determined that this claim lacked arguable merit and noted that trial counsel articulated a sound and reasonable basis for not further addressing the clothing found at the dumpsite.

(Doc. 35-1 at 212-15; Doc. 35-1 at 256). The PCRA court noted that Gacha "advised [his attorney] that he was present at the scene and, therefore, logically his blood may be there and the victim's blood may be on his clothing." (Doc. 35-1 at 213). The state courts noted that Gacha's blood was found at the crime scene, and his DNA and that of the decedent were found on the clothing, admittedly owned by Gacha, that had been discarded at a dumpsite not far from the crime scene. The state courts found that counsel exhibited reasonable trial strategy with respect to this claim, particularly after considering Gacha's admission that he was present at the crime scene. The state courts' determination that counsels' performance was not deficient is not an unreasonable application of <u>Strickland</u>. Gacha has not demonstrated that trial counsels' strategy of not addressing the clothing could never be considered part of a sound strategy. Nor has he established that the proceedings resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Thus, Gacha is not entitled to habeas relief on this claim.

8. ***Gacha's claim that the Superior Court added an additional requirement to the Strickland/Pierce test***

Gacha alleges that the Superior Court added an additional prong to the <u>Strickland/Pierce</u> test for ineffective assistance of counsel claims. In considering the instant ineffectiveness claims, the Pennsylvania Superior Court articulated a standard which is clearly in line with prevailing federal law, as it recited the <u>Commonwealth v. Cox</u>, 983 A.2d 666 (Pa. 2009) factors as the guideposts it would

use in assessing the ineffectiveness claims. (Doc. 35-1 at 247-48). The Pennsylvania Superior Court stated the standard as follows:

> To establish ineffectiveness of counsel, a PCRA petitioner must show the underlying claim has arguable merit, counsel's actions lacked any reasonable basis, and counsel's actions prejudiced the petitioner. Commonwealth v. Cox, 983 A.2d 666, 678 (Pa. 2009). Prejudice means that, absent counsel's conduct, there is a reasonable probability the outcome of the proceedings would have been different. Id.

(Doc. 35-1 at 247-48).

To maintain an ineffective assistance of counsel claim, counsel's performance must have been deficient, and this deficiency must have prejudiced the defense. Strickland, 466 U.S. at 694. To satisfy the prejudice prong, the petitioner must show that there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. Id. Further, the petitioner must show that he had a reasonable likelihood of prevailing on the motion at issue, and having prevailed on the motion, it was also reasonably likely that the result of the trial would have been different. See Thomas, 428 F.3d at 502. The Pennsylvania Superior Court decided Gacha's ineffective assistance of trial counsel claims under a standard that is entirely consistent with that set forth in Strickland. Consequently, the court will deny habeas relief on this ground.

### C.     Due Process Claim related to Petition for Allowance of Appeal

Gacha contends that the Pennsylvania Supreme Court violated his right to due process by failing to timely decide his petition for allowance of appeal. (Doc. 2 at 26). The following timeline summarizes the dates relevant to this claim. On May 9, 2012, Gacha filed a *pro se* PCRA petition. (Doc. 31-4 at 6-29, PCRA Petition). On

June 27, 2011, the PCRA court denied the petition. (Doc. 35-1 at 165-181, PCRA

Opinion and Order dated June 27, 2011). On July 27, 2011, Gacha filed a notice of

appeal to the Pennsylvania Superior Court. Commonwealth v. Gacha, No. 1373

MDA 2011 (Pa. Super. 2011). On June 27, 2012, the Pennsylvania Superior Court

affirmed the PCRA court's order denying the petition. (Doc. 35-1 at 246-56,

Commonwealth v. Gacha, No. 1373 MDA 2011 (Pa. Super. 2011)). On July 26, 2012,

Gacha filed a petition for allowance of appeal with the Pennsylvania Supreme

Court. Commonwealth v. Gacha, No. 637 MAL 2012 (Pa. 2012). On August 22, 2012,

the pleadings were perfected. Id. On December 24, 2012, the Pennsylvania

Supreme Court denied the petition for allowance of appeal. (Doc. 35-1 at 259,

Pennsylvania Supreme Court Order Denying Petition for Allowance of Appeal, No.

637 MAL 2012).

     The Internal Operating Procedures of the Pennsylvania Supreme Court

provide, in pertinent part:

> Allowance of appeal reports shall be circulated within ninety (90) days
> of the receipt of such an assignment. The proposed disposition date
> shall not be greater than sixty (60) days from the date of circulation.
> Holds may be placed on petitions for allowance of appeal only upon
> written notice to the members of the Court as to the reasons for the
> hold, e.g., the existence of another petition from another district
> presenting the same question. . . . A hold for the purpose of preparing
> a counter-report shall not exceed thirty (30) days; only by vote of the
> majority may a hold be extended beyond thirty (30) days, but in no
> event shall a hold for such purpose exceed ninety (90) days.

210 Pa. Code § 63.6(B).

     Gacha's petition was perfected on August 22, 2012. If a justice was assigned

that day, an allocatur report had to be filed within ninety days, on or before

November 20, 2012.  If the report was circulated on the last day, November 20, 2012, a proposed disposition date would be January 21, 2013.  The Pennsylvania Supreme Court denied Gacha's petition for allowance of appeal on December 24, 2012, within this date range.  Consequently, the court will deny habeas relief as to this claim.

## V.     Certificate of Appealability

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability ("COA"), an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254.  A COA may issue only if the applicant has made a substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  Miller-El, 537 U.S. at 327.  "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  Slack v. McDaniel, 529 U.S. 473, 484 (2000).  Here, jurists of reason would not find the disposition of this case debatable.  Accordingly, a COA will not issue.

## VI.  **Conclusion**

For the reasons set forth above, the court will deny the petition for writ of

habeas corpus.  A separate order shall issue.


 /S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania


Dated:      November 7, 2018